# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 1291 | **DATE** | 8/20/2004 |
| **CASE TITLE** | Thomas Snyder vs. Rod Blagojevich, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. State Official's motion is granted in its entirety, and FAC Counts I, II and III are dismissed. (12-1) Because Snyder's only remaining claim in the FAC Count IV common law claim for defamation against American Federation of State, County and Municipal Employees and its directors, which now lacks any federal anchor, this Court sua sponte dismisses that claim as well (but without prejudice), so that this entire action is dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | AUG 23 2004 | 33 |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | U.S. DISTRICT COURT CLERK | | |
| SN | courtroom deputy's initials | 2004 AUG 23 AM 8:00 FILED-EOD | Date/time received in central Clerk's Office | date mailed notice | |
| | | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

AUG 2 3 2004

THOMAS SNYDER,                      )
                                    )
              Plaintiff,            )
                                    )
       v.                           )    No.  04 C 1291
                                    )
ROD R. BLAGOJEVICH, et al.,         )
                                    )
              Defendants.           )

MEMORANDUM OPINION AND ORDER

Thomas Snyder ("Snyder") has alleged that Illinois Governor
Rod Blagojevich ("Blagojevich") and the Director of the Illinois
Department of Corrections ("DOC") Roger Walker, Jr. (collectively
"State Officials") violated 42 U.S.C. §1983 ("Section 1983") when
they dismissed him from his job as Assistant Warden of Programs
("Assistant Warden") at the Taylorville Correctional Center.  In
response State Officials have filed a motion for judgment on the
pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c), attaching
to their motion a position description promulgated by the
Illinois Department of Central Management Services ("Position
Description")(B-W Ex. B; see also Aff. of Maribeth Moore).[1]

This Court's June 4, 2004 memorandum order held that because
the Position Description was a matter outside of the pleadings,
State Officials' motion should be addressed as a Rule 56 (rather

_____

    [1] Other than Snyder's original pleading, citations to
materials submitted by Snyder are identified "S."  Citations to
materials submitted by State Officials are designated by their
individual initials:  "B-W."

33

than a Rule 12(c)) motion. Snyder was therefore given an opportunity to come forward with additional evidence. This Court's ensuing review of each side's memoranda and evidentiary submissions has confirmed that State Officials' motion, evaluated under Rule 56 standards, succeeds in its entirety.

<u>Rule 56 Standards</u>

All Rule 56 movants bear the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, (477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). Ultimately summary judgment is warranted only if all the pleadings and supporting documents indicate that a reasonable jury could not return a verdict for a nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Heck v. City of Freeport</u>, 985 F.2d 305, 307 (7th Cir. 1993)).

Because Snyder's motion was originally presented as a Rule 12(c) motion and acquired its Rule 56 status only after conversion by this Court, neither party has conducted any discovery. Nor has either party, pursuant to this District Court's LR 56.1, submitted evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. Thus faced with only a scant

evidentiary record (consisting primarily of two documents--the Position Description and Snyder's Affidavit), this Court looks as well to Snyder's First Amended Complaint ("FAC") to flesh out the factual background necessary to rule on State Officials' motion-- something that would be inappropriate if dealing with a post-discovery Rule 56 motion (see Rule 56(e)).[2]

## Facts

Over the course of his employment (at least seven years), Snyder moved up through the DOC ranks and eventually because Assistant Warden in September 2002 (FAC ¶8). He held that position until his termination one year later (id.).

Under the heading "COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS," the Position Description presents an overall statement of the responsibilities of an Assistant Warden:

> Under administrative direction of the Warden...plans, organizes and directs the entire Program Services for the rehabilitation and resocialization of residents...; formulates operating procedures and rehabilitation programs for areas of assignments; interprets and carries out policies of the Department of Corrections and institutional

---

[2] This approach is of course appropriate in the Rule 56 context (and cannot be complained about by Snyder), because it merely incorporates the even more lenient Rule 12(b)(6) or 12(c) standard that would require this Court to assume as true the facts alleged by Snyder in the FAC and to draw reasonable inferences in his favor (see, e.g., R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs, 335 F.3d 646, 647 (7th Cir. 2003); Pleva v. Norquist, 195 F.3d 905, 911 (7th Cir. 1999)).

superintendent; is administratively responsible and accountable for execution of policies and procedures and management of the institution while serving as Duty Warden.

That is followed by a more particularized list of six essential functions of the Assistant Warden job. For example, an Assistant Warden "plans, organizes and assumes direct responsibility" over a wide variety of prison services (Position Description ¶1). In addition an Assistant Warden must supervise prison staff, conduct daily inspection tours of the prison, speak to the public about institutional programs and answer public correspondence (Position Description ¶¶3-5). Finally, an Assistant Warden must assist the Warden "in carrying out policies, rules and regulations of the institution," must take responsibility for the execution of DOC policies and procedures when he serves as Duty Warden and must be available to perform "other duties as required or assigned which are reasonably within the scope of" his articulated responsibilities (Position Description ¶¶2, 6).

Snyder never received the Position Description (S. Aff. ¶4). And he maintains that the work he actually performed was more limited than the duties recited there (S. Aff. ¶¶8a-8p). Snyder sets forth a finite list of seven duties that he believes encompasses all of his duties as Assistant Warden (FAC ¶12; S. Aff. ¶¶6, 7b-7g, 7j-7u): (1) taking responsibility for "functions of academic and vocational, chaplaincy, clinical services, leisure time activities, medical and dental services

4

for inmates," (2) monitoring inmate programs, (3) assisting "the Warden to ensure orderly operations of daily functions," (4) supervising, guiding and training staff, (5) interacting with the public, (6) conducting daily inspection tours of the facility and (7) counseling inmates.

During his stint as Assistant Warden, Snyder also "spoke with his superiors" and "spoke out" regarding several problems he noticed at DOC (FAC ¶¶53-58). Snyder's criticism stemmed largely from the processes used to fill certain employment vacancies (FAC ¶¶53-55). More specifically, Snyder vocalized concerns that (1) DOC employees were violating federal and state requirements, (2) vacancies were not being filled with qualified corrections personnel and (3) labor and other nongovernmental organizations were interfering with the hiring process (id.). Snyder also stated his belief that DOC facilities were not being staffed at appropriate levels, articulated his thoughts on the safety of employees, inmates and the public at DOC facilities and advocated generally for DOC reorganization (FAC ¶¶ 56-58).

At the time of his dismissal Snyder was explicitly informed "that he was being terminated because of his affiliation with the Republican Party and the Republican administration and his lack of Democratic political sponsorship" (FAC ¶25). That promptly triggered this post-termination lawsuit.

## Application of the Rule 56 Standards

### Count I:  Patronage Dismissal

Snyder first alleges that State Officials infringed his First Amendment rights when they terminated his employment based on his political affiliation (FAC ¶¶19-25, 42).  Freedom of association is of course one of the core protections afforded by the First Amendment (see, e.g., <u>Thompson v. Ill. Dep't of Prof'l Regulation</u>, 300 F.3d 750, 755 (7th Cir. 2002)).  So the starting point for analyzing a patronage claim is the general proposition that government employees may not be terminated because of their political affiliations (<u>Carlson v. Gorecki</u>, 374 F.3d 461, 464 (7th Cir. 2004)).

But recognizing that First Amendment rights must sometimes give way to other vital government interests, the Supreme Court has carved out an exception to that general rule (<u>Elrod v. Burns</u>, 427 U.S. 347, 361, 372 (1976); <u>Branti v. Finkel</u>, 445 U.S. 507, 518 (1980)).  Although that is frequently referred to as the "policymaker" or "confidential employee" exception, those shorthand labels do not characterize the required analysis with total accuracy.

Instead the analysis of whether a government employer may consider politics when staffing a job position requires a court to engage in a functional inquiry that asks whether "party affiliation is an appropriate requirement for the effective

6

performance of the public office involved" (<u>Branti</u>, 445 U.S. at 518; see also <u>Carlson</u>, 374 F.3d at 464). While policymaking duties and access to confidential information are helpful guideposts to assess whether a position is within the purview of the <u>Elrod-Branti</u> exception, those job characteristics are neither required (nor are they necessarily sufficient) to reach the conclusion that personnel decisions involving a particular job position can be influenced by political affiliation (<u>Thompson</u>, 300 F.3d at 756; <u>Meeks v. Grimes</u>, 779 F.2d 417, 420 (7th Cir. 1985)).

As a threshold matter, it is essential to clarify what universe of job responsibilities dictates whether a job is within the <u>Elrod-Branti</u> exception. On that score our Court of Appeals has made it abundantly clear that a court must focus on the powers inherent in a position and not on the lesser duties that may be performed by any single occupant of that position (<u>Tomczak v. City of Chicago</u>, 765 F.2d 633, 640-41 (7th Cir. 1985); <u>Thompson</u>, 300 F.3d at 757 n.6). As <u>Tomczak</u>, 765 F.2d at 641 teaches:

> Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance.

Snyder's FAC and Affidavit speak at length about what types of duties he says he did not do himself (FAC ¶¶26-31, 33-35, 37;

7

S. Aff. ¶¶8a-8f, 8k-8p, 9-18).  To that end he has included

extensive information about numerous tasks in the Position

Description that he never actually performed in his tenure as

Assistant Warden, as well as delineating other activities that

were not part of his ordinary job responsibilities (for example,

dealing with confidential communications, having authority over

DOC budgets or hiring and firing, and acting "authoritatively on

any policy-making issue impacting the State of Illinois

Department of Corrections or their operations") (S. Aff. ¶¶8a-8f,

8k-8p, 9-18).  But all of that really misses the mark, because it

simply does not address the fact that then or at any time

thereafter State Officials may have found it useful or necessary,

and were entirely free to, assign one or more of the other duties

inherent in the Assistant Warden position (see <u>Heck</u>, 985 F.2d at

309).

Because it is definitively established that the

applicability of the <u>Elrod-Branti</u> exception hinges on the

universe of duties intrinsic in the Assistant Warden position

(and not on the lesser part of that universe Snyder may have been

called on to occupy generally or from time to time), the Position

Description provides the most comprehensive, detailed and

reliable source for ascertaining those intrinsic duties

(<u>Thompson</u>, 300 F.3d at 756-57).  And a thorough evaluation of the

duties set out in the Position Description reveals that the

8

Assistant Warden position falls squarely within the <u>Elrod-Branti</u> boundaries.[3]

Nothing in the Position Description suggests that an employee holding the Assistant Warden position necessarily creates formal overarching DOC policy or deals with confidential information. But as already suggested here, those two job characteristics do not define the entire breadth of the <u>Elrod-Branti</u> exception (see <u>Meeks</u>, 779 F.2d at 419-20). Instead our Court of Appeals pays heed to a key feature of bureaucratic government: Any employee who has a significant amount of discretionary responsibility to implement policy could also "reasonably serve to threaten the policy goals of the party in power" (<u>Selch v. Letts</u>, 5 F.3d 1040, 1044 (7th Cir. 1993)).

Indeed, the very existence of that responsibility renders all the more threatening to those policy goals the voicing of certain types of public criticism by the official in question that can subvert the attainment of those goals. It is obvious that trenchant criticism by an insider gets more attention (from the media, for example) and is more likely to be believed--even if it is wholly unjustified. And in light of that reality,

---

[3] This <u>Elrod-Branti</u> determination is entirely appropriate at the summary judgment stage, because the Position Description so clearly and completely describes the job duties of the Assistant Warden position that no reasonable jury could conclude that the inherent duties of the Assistant Warden position were anything other than as they were articulated in that document (see <u>Pleva</u>, 195 F.3d at 912).

government employers can consider political affiliation when making employment decisions about any position in which an employee is "vested with substantial discretionary authority in the implementation of the policy goals of elected officials" (<u>Upton v. Thompson</u>, 930 F.2d 1209, 1215 (7th Cir. 1991)).

Plainly the Position Description includes numerous duties inherent in the Assistant Warden position that embody just the kind of discretionary responsibility to implement State Officials' policy objectives concerning DOC of which <u>Elrod</u> and <u>Branti</u> are cognizant. For example, the Position Description requires that an Assistant Warden "plans, organizes and directs the entire" program of inmate "rehabilitation and resocialization." It mandates that an Assistant Warden actually "formulate operational procedures and rehabilitation programs." It explicitly states that an Assistant Warden "interprets and carries out [DOC] policies." And it specifies an Assistant Warden who must supervise staff, speak to the public and always be ready and willing to perform other duties assigned so him "that are reasonably within the scope" of his employment. Each of those job responsibilities presents myriads of opportunities for an Assistant Warden to influence how DOC policy plays out on the front lines on a daily basis.

Significantly, all of those job duties are also quite broad in scope and cannot by definition be defined in precise and

10

limited terms (Elrod, 427 U.S. at 368). Instead they are the types of responsibilities that must be augmented and fine-tuned as they unfurl--a task that will inevitably be fleshed out with the individual's own policy views (see Pleva, 195 F.3d at 913; Thompson, 300 F.3d at 756).[4]

To be sure, the Position Description says that an Assistant Warden is to carry out his responsibilities "[u]nder administrative direction of the Warden." But that is merely reflective of the type of hierarchy involved in any organization of size--it does not at all connote a situation in which the Warden gives direct heed to, or even oversees directly, all of the particulars of the Assistant Warden's performance. Instead the level of substantial responsibility for policy implementation is not dependent on an employee's precise location in a hierarchical structure (Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981)). And a government employee need not have unfettered discretion or ultimate decisionmaking authority to trigger the Elrod-Branti exception (id.; Americanos v. Carter, 74 F.3d 138, 142 (7th Cir. 1996)).

To fulfill several of his prescribed duties (such as

_____

[4] Tomczak, 765 F.2d at 641 cautions that courts should not take an "unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." That warning seems exceedingly applicable here, given that an Assistant Warden regularly makes choices about how best to implement policies in the highly politicized criminal justice area.

11

creating a program of rehabilitation and resocialization for
inmates, formulating DOC operating procedures, interpreting and
carrying out DOC policy, developing strategies for staff
management and supervision and generally assisting the Warden in
carrying out DOC policies, rules and regulations), an Assistant
Warden must inevitably participate in discussions about a whole
slew of programmatic and operational issues--topics on which
there is ample "room for principled disagreement on goals or
their implementation" (Nekolny, 653 F.2d at 1170).  And simply
engaging in such dialogues is enough to bring the Assistant
Warden position within the Elrod-Branti ambit (Americanos, 74
F.3d at 142).  Indeed, Snyder's own FAC ¶70 alleges that State
Officials were aware of his "activities in furtherance of public
policy."

Finally, Branti, 445 U.S. at 518 teaches that political
affiliation is also an  appropriate consideration where an
employee acts as a governmental spokesperson (and see, e.g., the
application of Branti in Jimenez Fuentes v. Torres Gaztambide,
807 F.2d 236, 240 n. 8 (1st Cir. 1986)).  Because the Position
Description specifies that an Assistant Warden "speaks to lay and
professional groups regarding various institutional programs" and
"answers correspondence from the general public," State Officials
had a legitimate interest in ensuring that any person who held
the Assistant Warden position would accurately represent their

12

policy viewpoints in his interactions with the public (see Martinez-Sanes v. Turnbull, 318 F.3d 483, 489-90 (3d Cir. 2003)).

Given the duties that the Position Description requires an Assistant Warden to perform--including at least some discretionary responsibility for policy implementation pursuant to meaningful discussion, as well as significant interaction with the public--State Officials could properly have determined that membership in the same political party as Blagojevich was essential to the job.[5] Based on that analysis, the Assistant Warden position is well within the Elrod-Branti exception. Summary judgment in State Officials' favor is therefore warranted on Count I, because no reasonable jury could conclude that Snyder's termination was unlawfully linked to his political affiliation (see Branti, 445 U.S. 518).[6]

---

[5] In that respect, State Officials could well have viewed the criticisms that Snyder voiced (FAC ¶¶53-58, set out in the penultimate paragraph of the Facts section of this opinion) as themselves politically motivated, intended to serve the Republican Party cause with which Snyder was affiliated by casting Blagojevich's administration and his Democratic Party in a bad light. See the later discussion as to Snyder's Count II.

[6] Snyder Mem. 4 unpersuasively invokes Ruffino v. Sheahan, 218 F.3d 697, 700 (7th Cir. 2000) to argue that bringing an Assistant Warden within the Elrod-Branti exception is a "remarkable extension of the policymaker line of cases." To the contrary, nothing in the political patronage jurisprudence suggests that considering the number of employees who hold a position with a given title in a multibranch organization is part of the Elrod-Branti inquiry. In fact, Ruffino itself properly rested on a finding about the functions that were performed by employees who held the position in question, not on the sheer number of employees serving in the position (id. at 700-01).

Count II:  Retaliation

Next Snyder asserts that his First Amendment rights were infringed because his termination was also motivated by "positions he had taken on matters of public concern" (FAC ¶¶ 59, 62).  That claim of retaliation based on speech is analytically distinct from (although it is related to) Snyder's Count I patronage claim (see Ryan v. Ill. Dep't of Children & Family Servs., 185 F.3d 751, 759 (7th Cir. 1999); Heideman v. Wirsing, 7 F.3d 659, 661-62 (7th Cir. 1993)).

Undoubtedly "[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech" (Wilbur v. Mahan, 3 F.3d 214, 215 (7th Cir. 1993)).  But while employees no longer shed all First Amendment rights at the door of their government employer,[7] the unique concerns of government qua employer (most notably requiring the efficient delivery of public services) mean that government employees can expect their First Amendment speech rights to be somewhat circumscribed in the

---

Moreover, here there are some 50 to 100 Assistant Wardens in all of Illinois (the exact number is not precisely identified in the pleadings, but it is not critical)(FAC ¶¶ 10-11; S. Mem. 4)--in all events, far below "the hundreds of deputy sheriffs in Cook County" alone who were found to be outside the Elrod-Branti exception in Ruffino, 218 F.3d at 700-01.

[7]  Contrast Justice Holmes' famous oversimplification in McAuliffe v. Mayor & Board of Aldermen, 29 N.E. 517 (Mass. 1892):

> The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.

14

context of their employment (id. at 216).

Whether Snyder's speech is constitutionally protected is a question of law for the court (Sullivan v. Ramirez, 360 F.3d 692, 698 (7th Cir. 2004)). And Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, 391 U.S. 563 (1967) announced a two-part test to evaluate whether a governmental employer who terminates an employee based on his or her speech has violated the First Amendment: First the court asks whether the employee was speaking on a matter of "public concern" (Warzon v. Drew, 60 F.3d 1234, 1238 (7th Cir. 1995)), and if so the court balances the employee's First Amendment interests against the interests of the government employer in the circumstances at issue (id.).

But a series of cases from our Court of Appeals has consistently held that the Pickering balancing approach does not come into play--it is obviated--when an employee within the Elrod-Branti exception "has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies" (Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 971 (7th Cir. 2001)). In addition to Vargas-Harrison, see, e.g., the earlier decisions in Wilbur, 3 F.3d at 218, Warzon, 60 F.3d at 1239, Ryan, 185 F.3d at 759 and Bonds v. Milwaukee County, 207 F.3d 969, 977-78 (7th Cir. 2000)).

Because it has already been held that Snyder, as Assistant Warden, fits within the contours of the Elrod-Branti exception,

and because for analytical purposes it may be assumed arguendo that Snyder's comments implicated matters of public concern because they bore on the Illinois penal system and corresponding budgetary considerations (see <u>Bonds</u>, 207 F.3d at 980), it remains to consider whether the character of his speech conformed to the <u>Vargas-Harrison</u> description. And on that score Snyder's own FAC allegations have talked him out of court.

Snyder has expressly acknowledged that all of the attacks he launched at his superiors were aimed at personnel decisions, organizational choices and related safety issues. Most of his criticisms addressed how State Officials were going about filling numerous employment vacancies, while the remainder touched on DOC safety and organization. And those matters clearly implicated work-related policy choices within Snyder's ken: It will be remembered that the Position Description makes the Assistant Warden responsible for supervising staff and conducting daily inspection tours and states the Assistant Warden "interprets and carries out" DOC policies, assists the Warden in "carrying out policies, rules and regulations of the institution ensuring orderly operation of daily functions of the institution" and "formulates operating procedures."

Far from being "forms of expression that have no conceivable bearing on his job" (<u>Wilbur</u>, 3 F.3d at 217), all of Snyder's criticisms were intimately related to several of his concrete job

16

responsibilities--and they were most certainly linked to his more broad and discretionary duties. So this Court properly eschews Pickering balancing and holds that even if State Officials' decision to terminate Snyder relied entirely on his critical statements, he also fails on his retaliation claim as a matter of law.[8]

## Count III: Due Process

Finally, Snyder contends that he had a property interest in his continued employment with DOC and that State Officials deprived him of his Fourteenth Amendment right to due process when they terminated him (and effectively extinguished that property interest) as they did (FAC ¶¶80, 82-83). But as before, that claim too is a loser.

Establishing a due process violation is a two-step process that requires a plaintiff to show first that he had a property interest and next that he was deprived of that interest without due process of law (Phelan v. City of Chicago, 347 F.3d 679, 681 (7th Cir. 2003)). Here Snyder falls at step one, so there is no need to consider the second step.

For a government employee, the existence of a property

---

[8] Indeed, the same conclusion would follow even if a Pickering analysis were called for. In those terms State Officials' interests in ensuring that the Assistant Warden was performing his duties satisfactorily, in maintaining harmony in the workplace and in assuring that Snyder would conduct himself in a manner commensurate with their policy objectives would surely trump Snyder's First Amendment claim.

interest in continued employment requires that interest to have been created either by an independent source such as a state statute or via a clearly implied promise of continued employment made by a government official with the proper authority (<u>Phelan, id.</u>; see also <u>Zemke v. City of Chicago</u>, 100 F.3d 511, 513 (7th Cir. 1996)). With no state statute to look to, Snyder must perforce follow that second path. To that end he attempts to stake his bet on a comment by Blagojevich that assured "Snyder and others employed by the State of Illinois that he was not looking to purge state government of different men and women who were hired during Republican administrations" and that said "if men and women working for the State of Illinois were satisfactorily performing necessary jobs, they would not be terminated" (FAC ¶¶78, 80).

But Snyder loses his bet immediately, because even if such amorphous statements were urged to be viewed as firm commitments of ongoing employment to individuals who were neither spoken to nor named nor described in the statements (a highly dubious notion at best--see, e.g., <u>Tolmie v. United Parcel Serv., Inc.</u>, 930 F.2d 579, 581 (7th Cir. 1991)), Blagojevich did not himself have any authority to make such an employment promise that would bind the State of Illinois (see <u>Shlay v. Montgomery</u>, 802 F.2d 918, 921-22 (7th Cir. 1986)). As such, his asserted comments could never form the basis for a "mutually explicit

"understanding" that could give Snyder a legitimate property interest in his job as Assistant Warden (Wolf v. City of Fitchburg, 870 F.2d 1327, 1334 (7th Cir. 1989)).

FAC ¶¶74-77 speak of three individual sources--the Illinois Constitution, numerous Illinois statutes and an Executive Order-- as purportedly conferring on Blagojevich the authority to make a promise of continued employment to Snyder (FAC ¶¶74-77). This Court's March 9, 2004 memorandum opinion and order has already held that Snyder's invocation of constitutional and statutory references as claimed sources of Blagojevich's authority is entirely without merit. As for Executive Order No. 1 (B-W Ex. F), it merely reflects that Blagojevich held the ultimate budgetary reins in Illinois and could institute a hiring and promotion freeze to stabilize the governmental payroll--it does not create a reasonable inference, let alone state, that Blagojevich had control over DOC employment decisions. In sum, the statements that the FAC ascribes to Blagojevich created no authorized and binding employment contract between Snyder and the State of Illinois and thus could not create a property interest in Snyder's job (Pleva, 195 F.3d at 915).

Snyder Mem. 11 makes one last ditch effort to salvage his claim: Even in the absence of a valid oral contract between Snyder and Blagojevich, he says he could still have "a legitimate claim of entitlement" stemming from "[l]egitimate and reasonable

reliance on a promise from the state." But that attempted
bootstrapping fails as well, for any claimed reliance on the
statements ascribed to Blagojevich--an official without actual
authority to make a firm and binding commitment--would be neither
legitimate nor reasonable (see <u>Shlay</u>, 802 F.2d at 921).

All roads thus lead to the same destination: the absence of
a property interest in Snyder's job as Assistant Warden. And
without any property interest in his continued employment,
Snyder's due process claim also fails as a matter of law (<u>Pleva</u>,
195 F.3d at 915).

### Conclusion

Even under the most lenient Rule 56 standard, no reasonable
jury could conclude that Snyder can prevail on any of his Section
1983 claims against State Officials.[9] That being so, State
Officials' motion is granted in its entirety, and FAC Counts I,
II and III are dismissed. One final point: Because Snyder's
only remaining claim is the FAC Count IV common law claim for
defamation against American Federation of State, County and
Municipal Employees and its directors Henry Bayer and Buddy
Maupin, which now lacks any federal anchor, this Court sua sponte

---

[9] It is also worth observing that because State Officials'
conduct plainly does not violate Snyder's clearly established
statutory or constitutional rights, State Officials are also
shielded from liability by the umbrella of qualified immunity
(see, e.g., <u>Pounds v. Griepenstroh</u>, 970 F.2d 338, 339 (7th Cir.
1993)).

dismisses that claim as well (but without prejudice, of course--see, e.g., _Pleva_, 195 F.3d at 918), so that this entire action is dismissed.

Milton I. Shadur
Senior United States District Judge

Date: August 20, 2004